907 A.2d 395

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
KEITH R. DOMICZ, DEFENDANT–RESPONDENT.

Argued March 21, 2006—Decided September 20, 2006.

*Paul H. Heinzel* and *Leslie–Ann M. Justus,* Deputy Attorneys General, argued the cause for appellant (*Zulima V. Farber,* Attorney General of New Jersey, attorney; *Mr. Heinzel, Ms. Justus, Deborah C. Bartolomey, Daniel I. Bornstein* and *Russell J. Curley,* Deputy Attorneys General, on the briefs).

*Alison S. Perrone,* Designated Counsel, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

*William H. Buckman* and *Justin T. Loughry* submitted a brief on behalf of *amicus curiae,* Association of Criminal Defense Lawyers of New Jersey.

Justice ALBIN delivered the opinion of the Court.

This case involves defendant Keith R. Domicz's challenge to the constitutionality of a police search of his home that resulted in the seizure of nearly one hundred marijuana plants and assorted growing equipment. After a testimonial hearing, the trial court denied defendant's motion to suppress the evidence seized from his home, determining that defendant knowingly and voluntarily consented to the search. In overturning that ruling and ordering a new suppression hearing, the Appellate Division reached a number of novel legal conclusions that are not supported by our established constitutional jurisprudence and case law. Therefore, we now reverse.

## I.

### A.

A state grand jury returned an indictment charging defendant with first-degree maintaining or operating a controlled dangerous substance (CDS) production facility, in violation of *N.J.S.A.* 2C:35–4; first-degree possession with intent to distribute a CDS (marijuana), in violation of *N.J.S.A.* 2C:35–5(a)(1) and *N.J.S.A.* 2C:35–5(b)(10)(a); fourth-degree possession of a CDS (marijuana), in violation of *N.J.S.A.* 2C:35–10(a)(3); and third-degree possession

of a CDS (methamphetamine), in violation of *N.J.S.A.* 2C:35–10(a)(1).

At a suppression hearing, the State and defendant presented conflicting accounts of what occurred at defendant's home on July 27, 2000.[1] Detective William Peacock of the New Jersey State Police Marijuana Eradication Unit testified that defendant first attracted his attention six months earlier when he learned that defendant had received at his home in the Williamstown section of Monroe Township, Gloucester County, four packages of specialized horticultural equipment "commonly used to grow marijuana." That the equipment also had legitimate uses did not dampen the detective's interest. As part of the detective's investigation, a grand jury subpoena[2] was issued for the electrical use records of defendant's residence and two "comparable houses." With those records, the State Police supposedly could compare defendant's electrical usage in his home with similarly situated consumers. Those records, it appears, did not provide any useful information linking defendant's electricity consumption with the suspected harvesting of marijuana in his home.

About two months before the search, Detective Peacock conducted a thermal scan of defendant's home to determine whether an abnormal amount of heat was emanating from it.[3] Detective Peacock did not seek authorization for the thermal scan by means

[1] This statement of facts is based solely on the evidence presented at the suppression hearing.

[2] Although the suppression hearing transcript only refers to the issuance of a subpoena, the State represented to the Court at oral argument that the subpoena was issued by the grand jury.

[3] "Thermal imagers detect infrared radiation, which virtually all objects emit but which is not visible to the naked eye.... [I]t operates somewhat like a video camera showing heat images." *Kyllo v. United States,* 533 *U.S.* 27, 29–30, 121 *S.Ct.* 2038, 2041, 150 *L.Ed.*2d 94, 99 (2001). By conducting a thermal scan of defendant's home, police could determine whether an unusual amount of heat was coming from the building, which might indicate the use of specialized growth equipment, such as grow lamps.

of a search warrant because he did not think that a warrant was necessary.[4]   The thermal scan, as well as Detective Peacock's frequent drives by defendant's home on his commute to work, did not provide any investigative leads.

On the rainy morning of July 27, 2000, accompanied by two State Police detectives, a Monroe Township Police detective, and a Gloucester County Prosecutor's Office detective, Detective Peacock went to defendant's home for a "knock and talk."   The goal was to speak with defendant and, if possible, gain his consent to search his home.   Detective Peacock admitted that he did not have probable cause to secure a search warrant.

The officers were all dressed in plain clothes.   Three proceeded to defendant's front door while Detective Peacock and State Police Detective Dennis Donovan approached the back door by passing through a gate that separated the driveway from the rear of the residence.   Because of the location of cars in defendant's driveway, it appeared to Detective Peacock that the back door was used as an entrance to the home.   Immediately after Detective Peacock knocked on the door, State Police Detective Sergeant Joe DiBiase advised him that defendant was at the front door.   Detectives Peacock and Donovan then joined the other officers at the front of the house.   In a calm and professional tone, with the other officers standing behind him, Detective Sergeant DiBiase identified himself to defendant and told him, "We need to speak to you." Defendant invited the officers inside, saying, "Come on in, get out of the rain."

As soon as Detective Peacock entered the house, he "detected a strong odor of raw marijuana."   Detective Peacock introduced

---

[4] The thermal scan of defendant's house was conducted prior to the United States Supreme Court's decision in *Kyllo v. United States, supra.*   In that case, decided June 11, 2001, the Court held that use of a thermal imaging device by police to detect the amount of heat emanating from a person's home constituted a search for Fourth Amendment purposes, and thus was unconstitutional absent a warrant supported by probable cause.   533 *U.S.* at 40, 121 *S.Ct.* at 2046, 150 *L.Ed.*2d at 106.

himself as a member of the State Police Marijuana Eradication Unit and said, "We're here to request permission to search your residence." They were standing in a small room, about eight or ten feet square, adjacent to the kitchen, where defendant's girlfriend was located. Detective Peacock then presented to defendant a consent-to-search form and began reading and explaining the form to him. At that point, defendant put his head down and said, "I have 40 plants in the basement." Detective Peacock responded, "We'll get to that in a minute," and continued reading the consent form in its entirety to defendant, who was listening attentively and looking at the form. Among other things, Detective Peacock advised defendant that he had the right to refuse to give consent to the search. At no point did the other detectives surround, hover over, or intimidate defendant. After the form was read to him, defendant authorized the search by signing the form beneath the following acknowledgement: "I have knowingly and voluntarily given my consent to the search ... and fully understand that I have the right to refuse giving my consent to search."

The detectives then searched the house. At the foot of the basement stairs, they found thirty-nine marijuana plants stashed in garbage bags. In a makeshift plywood room in the basement, they found forty-four actively growing marijuana plants, as well as apparatus for cultivating marijuana plants. They also found nine clear plastic bags containing processed marijuana in the kitchen freezer; three bags of marijuana, a digital scale, and a bag of methamphetamine in the master bedroom; and a bag of marijuana in another bedroom. In addition, Detective Peacock and two of the officers observed in plain view another fourteen marijuana plants growing next to the garage.

Defendant offered a starkly different version of the events surrounding the search. Defendant testified that at around 7:00 or 8:00 a.m. on July 27, 2000, three detectives arrived at his front door. The "head guy" showed him a badge and stated that he had a search warrant, and then, without asking permission, the three

detectives entered his house. The detectives then opened the back door, letting in two other officers. Defendant was handcuffed, told to sit on a couch where his girlfriend was also seated, and read his rights. Approximately one hour later, the detectives presented a document to defendant without reading or explaining it to him. Defendant signed the folded document as he was told to do. He denied that he ever read the document or was ever advised of his right to refuse to consent to the search. He also suggested that the detectives concealed the contents of the document by folding it in half before he signed it.

Retired State Police Lieutenant Vincent Bellaran testified for the defense. He stated that the detectives involved in the case did not use the most recently issued consent form, which apparently had been adapted to deal with motor vehicle stops. Last, the trial court did not allow defense witness Alan Hart, a polygraph examiner, to testify about the results of a polygraph examination taken by defendant.

In denying defendant's motion to suppress, the trial court determined that the State had carried its burden of proving by clear and convincing evidence that defendant voluntarily and knowingly consented to the search of his house and garage. The court made specific credibility findings, accepting Detective Peacock's testimony and rejecting defendant's testimony as unbelievable. The court did not credit defendant's argument that the detectives tricked and coerced him into signing the consent form or that they had folded it in half to conceal its true nature. The court accepted as truthful Detective Peacock's assertion that he smelled the odor of raw marijuana upon entering defendant's house. The court also weighed favorably Detective Peacock's candid admission that he did not have probable cause to conduct a search at the time he proceeded with the "knock and talk" with defendant. The court found Lieutenant Bellaran's testimony to have no value because the Lieutenant did not specify whether the consent "forms are different for motor vehicle searches as opposed to" other kinds of searches.

After entering into a plea agreement with the State, defendant pled guilty to operating a CDS production facility. On that charge, the court sentenced defendant to ten years imprisonment with a forty-month parole ineligibility period, imposed financial penalties, and suspended his driving privileges for twelve months. In accordance with the plea agreement, the remaining charges were dismissed.

Defendant appealed the denial of his suppression motion.

### B.

The Appellate Division reversed the trial court's suppression order and vacated his conviction based on its determination that the warrantless thermal scan of defendant's home violated the Fourth Amendment of the United States Constitution and the warrantless seizure of his utility records violated Article I, Paragraph 7 of the New Jersey Constitution. *State v. Domicz,* 377 *N.J.Super.* 515, 561, 873 *A.*2d 630 (App.Div.2005). The appellate panel remanded for a new hearing before a different judge to consider "whether [defendant's consent] was tainted by the prior unlawful conduct" and to weigh the impact of that conduct "(1) on the credibility of the police version of the alleged consent search, (2) on the legitimacy of the manner in which the police sought consent, and (3) on whether police had a reasonable suspicion that would justify seeking defendant's consent to a search of his home." *Id.* at 548–59, 873 *A.*2d 630. The panel also concluded that the court "erred by failing to allow testimony about a polygraph test administered to defendant." *Id.* at 523, 873 *A.*2d 630.

The warrantless thermal scan of defendant's home in this case occurred more than one year before the United States Supreme Court in *Kyllo v. United States,* 533 *U.S.* 27, 40, 121 *S.Ct.* 2038, 2046, 150 *L.Ed.*2d 94, 106 (2001), ruled that the Fourth Amendment required law enforcement officers to secure a warrant to conduct such a "search." *Domicz, supra,* 377 *N.J.Super.* at 530–31, 873 *A.*2d 630. Before *Kyllo,* a majority of courts in the country did not consider a thermal scan a search triggering the

protections of the Fourth Amendment. *Id.* at 532, 873 *A.*2d 630. Nonetheless, the panel held that Detective Peacock and his fellow officers should have anticipated that under Article I, Paragraph 7 of our State Constitution, the courts of this State would prohibit thermal scans of homes without a warrant. *Id.* at 532–34, 873 *A.*2d 630.

Similarly, the panel held that the officers should have anticipated that a warrantless seizure of utility records would also be declared an unreasonable seizure under Article I, Paragraph 7 by our state courts. *Id.* at 536–38, 873 *A.*2d 630. In this "matter of first impression" in New Jersey, the panel concluded "that there is a legitimate expectation of privacy in electrical usage records maintained by a power company that precludes the intrusion of law enforcement in the absence of a warrant." *Id.* at 538, 546, 873 *A.*2d 630.

The panel considered the conducting of a thermal scan without a warrant and the acquisition of the electrical utility records by a grand jury subpoena to be not only "unlawful conduct," but also prior bad acts evidence that might suggest that the police also engaged in an unlawful search of defendant's home. *Id.* at 549–50, 873 *A.*2d 630. "In other words," the panel explained, "the [court] is entitled to doubt the likelihood that the officers acted in a constitutionally permissible manner on July 27, 2000, when they did not so act on prior occasions." *Id.* at 549, 873 *A.*2d 630. The "prior willingness of the police to engage in unlawful conduct," the panel stated, could be used to impugn the "credibility of the police version" and lead a court to conclude that defendant's account was the more believable one. *Id.* at 549–50, 873 *A.*2d 630. In the same vein, the panel maintained that at a new suppression hearing the court could consider "whether the warrantless intrusion by Detective Peacock and another officer into the gated backyard of defendant's property" violated the Fourth Amendment and, if so, its impact on "the credibility of the State's contention that the police acted lawfully when seeking defendant's consent to a search of his home." *Id.* at 550, 873 *A.*2d 630.

Additionally, although defendant did not raise the issue either at the suppression hearing or on appeal, the panel held that police officers must have a reasonable and articulable suspicion that criminal activity is occurring inside a home before requesting consent to search the premises. *Id.* at 551, 873 *A.*2d 630. By that first-time-ever ruling, the panel extended to the searches of homes the standard that we made applicable to searches of motor vehicles in *State v. Carty,* 170 *N.J.* 632, 790 *A.*2d 903, *modified on other grounds,* 174 *N.J.* 351, 806 *A.*2d 798 (2002). *Domicz, supra,* 377 *N.J.Super.* at 551, 873 *A.*2d 630. The panel "seriously question[ed] whether this standard could be met on the evidence" in the present case. *Ibid.*

Finally, the panel concluded that defendant should have been given the opportunity to present the results of the polygraph test administered to him by a private polygraph examiner. In yet another matter of first impression, the panel determined that the admissibility of polygraph evidence "in a non-jury setting" is not dependent on a prior agreement between the State and the defendant, thus carving out an exception to the stipulation requirement of *State v. McDavitt,* 62 *N.J.* 36, 297 *A.*2d 849 (1972). *Domicz, supra,* 377 *N.J.Super.* at 557–58, 873 *A.*2d 630. The panel expressly held that subject to *N.J.R.E.* 403, "polygraph evidence may be admitted at a suppression hearing, even in the absence of the consent of the State, when credibility is an issue." *Id.* at 559–60, 873 *A.*2d 630.

We granted the State's motion for a stay of the Appellate Division decision, and then its petition for certification. 185 *N.J.* 268, 883 *A.*2d 1064 (2005). We also granted the motion of the Association of Criminal Defense Lawyers of New Jersey to participate as amicus curiae.

## II.

We begin by addressing whether the warrantless conducting of a thermal scan of defendant's home and the acquiring of defendant's electric utility records pursuant to a grand jury subpoena

constituted "unlawful conduct" that could taint the consent search of defendant's home. The Appellate Division submits that the willingness of the police officers to engage in prior misconduct is evidence that might suggest that the consent search was itself a sham. *Domicz, supra,* 377 *N.J.Super.* at 548–50, 873 *A.*2d 630. The panel contends that the prior illegalities could impugn the credibility of Detective Peacock's account of what occurred on July 27, 2000. *Ibid.*

### A.

First, the panel's conclusion that the police officers in this case engaged in "prior unlawful conduct" that tainted the consent search cannot be supported on this record. When Detective Peacock conducted the warrantless thermal scan of defendant's home in May 2000, a majority of the federal circuit courts of appeal had ruled that such a surveillance procedure did not constitute a "search" within the meaning of the Fourth Amendment. *United States v. Elkins,* 300 *F.*3d 638, 646 (6th Cir.2002). In those jurisdictions, therefore, the police did not have to seek a warrant to engage in a procedure that was not deemed a search. At the time of the thermal scan of defendant's home, no court in this State had addressed the issue. In June 2001, the constitutional landscape became clear when in a five-four decision the United States Supreme Court issued *Kyllo v. United States, supra.* There, the Court held that when law enforcement officials "use[ ] a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant" under the Fourth Amendment. 533 *U.S.* at 40, 121 *S.Ct.* at 2046, 150 *L.Ed.*2d at 106.

We need not decide here whether *Kyllo* should retroactively apply to this case, which was on appeal at the time of the United States Supreme Court's decision, or whether this State would have come to a similar result under Article I, Paragraph 7 to the one reached by the *Kyllo* majority. From the record before us,

Detective Peacock learned nothing of value from the thermal scan of defendant's home. Accordingly, there was nothing wrongfully seized that law enforcement could exploit to defendant's detriment. *See Wong Sun v. United States,* 371 *U.S.* 471, 485, 83 *S.Ct.* 407, 416, 9 *L.Ed.*2d 441, 454 (1963); *State v. Badessa,* 185 *N.J.* 303, 311, 885 *A.*2d 430 (2005). No one has suggested that Detective Peacock developed a lead from the scan or that it somehow furthered the investigation. Without any tangible result from the scan, there was nothing to suppress. Thus, even if *Kyllo* applied, we fail to see how the thermal scan affected the later consent search.

We cannot agree with the Appellate Division that the failure of the law enforcement officials in this case to anticipate the *Kyllo* decision, along with most federal circuit courts, suggests willful misconduct, or that such a lack of prescience should be considered part of a pattern of illegality or be used to impair the credibility of an investigating detective. Nor can we agree that the officers may have engaged in willful misconduct because they did not have the foresight to predict what this Court might have done under this State's Constitution if it had been faced with the *Kyllo* issue. Even experienced and able jurists, at times, have been unable to forecast decisions of this Court. To permit a court to infer willful wrongdoing from the failure of Detective Peacock to obtain a thermal scan warrant would be unfair and unreasonable in the circumstances of this case.

B.

■ We next determine that whatever privacy interest attached to defendant's utility records, the acquiring of those records by a grand jury subpoena satisfied Article I, Paragraph 7 of the State Constitution. The appellate panel appears to concede that no expectation of privacy recognized under the Fourth Amendment was breached when law enforcement officials obtained defendant's electric utility records through a grand jury subpoena. *See Domicz, supra,* 377 *N.J.Super.* at 534–38, 873 *A.*2d 630. However,

based on its view of this Court's Article I, Paragraph 7 search-and-seizure jurisprudence, the panel concluded that defendant had a reasonable expectation of privacy in those records under our State Constitution that required law enforcement officials to obtain a warrant supported by probable cause. *Id.* at 533–38, 873 *A.*2d 630. Therefore, the panel held that the seizure of defendant's electricity records by means of only a grand jury subpoena constituted an unlawful search. *Id.* at 534, 873 *A.*2d 630.

In rendering its decision, the Appellate Division did not have the benefit of our opinion in *State v. McAllister,* 184 *N.J.* 17, 875 *A.*2d 866 (2005). There, we held that "under the New Jersey Constitution, citizens have a reasonable expectation of privacy in bank records," but that "existing grand jury subpoena procedures sufficiently protect that expectation." *Id.* at 19, 875 *A.*2d 866. In light of that decision, neither defendant nor amicus curiae offer any persuasive reasons why electric utility records should be afforded greater protection than bank records.

We noted in *McAllister* that "the Federal Constitution does not recognize an expectation of privacy in bank records." *Id.* at 24–26, 875 *A.*2d 866 (citing *United States v. Payner,* 447 *U.S.* 727, 100 *S.Ct.* 2439, 65 *L.Ed.*2d 468 (1980); *United States v. Miller,* 425 *U.S.* 435, 96 *S.Ct.* 1619, 48 *L.Ed.*2d 71 (1976)). Therefore, under the Fourth Amendment neither a warrant nor a grand jury subpoena is required for law enforcement officials to gain access to such records. *See Payner, supra,* 447 *U.S.* at 732, 100 *S.Ct.* at 2444, 65 *L.Ed.*2d at 474; *Miller, supra,* 425 *U.S.* at 442–43, 446, 96 *S.Ct.* at 1623–24, 1626, 48 *L.Ed.*2d at 78–79, 81.

In contrast, under our State Constitution we "recognize a citizen's reasonable expectation of privacy in his or her bank records, even when those records are in the possession of the bank." *McAllister, supra,* 184 *N.J.* at 29, 875 *A.*2d 866. That privacy interest follows from the understanding that, by revealing a history of expenses and purchases, bank records can provide a "virtual current biography" of the account holder. *See id.* at 31, 875 *A.*2d 866. Bank customers provide personal financial informa-

tion to banks with the expectation that such information "will remain confidential" and not be turned over to the government "without adequate process." *Ibid.*

In *McAllister,* we acknowledged that an account holder's privacy interest in his bank records under the New Jersey Constitution must be weighed against the legitimate investigatory needs of law enforcement. *Id.* at 33, 875 *A.2d* 866. Thus, we held "that the issuance of a grand jury subpoena duces tecum based on a relevancy standard satisfies the constitutional prohibition against improper governmental intrusion." *Id.* at 36, 875 *A.2d* 866. We declined to impose a probable cause standard as a precondition to law enforcement officials obtaining a subpoena for bank records. *Id.* at 33–34, 36, 875 *A.2d* 866. Instead, we applied the prevailing standard for the issuance of a grand jury subpoena, requiring only that the records sought "bear some possible relationship, however indirect, to the grand jury investigation." *Id.* at 34, 875 *A.2d* 866 (internal quotation marks omitted).

We discern no basis for treating electric utility records differently from bank records. We do not accept defendant's comparison of warrantless thermal scanning of a home, which detects amounts of heat emanating from within the premises, to acquiring of utility records by a grand jury subpoena. Although both reveal details about activities within the home, thermal scanning is the equivalent of a physical intrusion into a residence by means of a highly sophisticated surveillance apparatus and therefore constitutes a "search" for purposes of the Fourth Amendment. *See Kyllo, supra,* 533 *U.S.* at 35–36, 40, 121 *S.Ct.* at 2044, 2046, 150 *L.Ed.2d* at 103, 106. We are not aware of any case that holds that obtaining residential utility records by lawful process is akin to a home invasion or constitutes a search.

Bank records expose much more about a person's private life and activities within the home than utility records. Bank records may reveal all types of household items purchased and possessed by a person, such as furniture, artwork, and electronic equipment. Through check and debit card payments, those records may

disclose what a person eats and drinks, what newspapers and magazines he reads, and even where he vacations. Bank records also may indicate the amount of a person's utility and telephone bills. In comparison, utility records reveal only the total amount of electricity a person is using in his home on a periodic basis and the amount being paid for those services. It does not divulge personal details—whether or when the person is watching television, talking on the telephone, or using any particular appliance. Thus, one could easily conclude that a person has a far greater expectation of privacy in his bank records than his utility records.

Significantly, no state court has interpreted its own constitution to mandate that the police first obtain a warrant to obtain electric utility records. The state courts that have considered the issue have rejected the notion that there is a legitimate expectation of privacy in such records. *See Samson v. State*, 919 *P*.2d 171, 173 (Alaska Ct.App.1996) (holding that no reasonable expectation of privacy in utility records exists under Alaska Constitution); *People v. Stanley*, 72 *Cal.App.*4th 1547, 86 *Cal.Rptr.*2d 89, 94 (1999) (finding that defendant did not have "a reasonable expectation of privacy in the quantity of electricity delivered by the utility to [his] house"); *People v. Dunkin*, 888 *P*.2d 305, 307 (Colo.Ct.App. 1994) (holding that there is no reasonable expectation of privacy in utility records under either State or Federal Constitution), *cert. denied, Smith v. Colorado*, 515 *U.S.* 1105, 115 *S.Ct.* 2251, 132 *L.Ed.*2d 259 (1995); *State v. Kluss*, 125 *Idaho* 14, 867 *P*.2d 247, 254 (App.1993) (finding that there is no reasonable expectation of privacy in power records under State Constitution); *In re Pers. Restraint of Maxfield*, 133 *Wash.*2d 332, 945 *P*.2d 196 (1997) (majority of justices concluding that no reasonable expectation of privacy exists in utility records under State Constitution).[5]

---

[5] We note that the Appellate Division misread *Maxfield*, a case comprised of three separate opinions. The panel asserted that *Maxfield* was "the only case we are aware of that has found a reasonable expectation of privacy in [utility] records." *See Domicz, supra,* 377 *N.J.Super.* at 540, 873 *A.*2d 630. In fact, five of nine justices concluded "that there is no constitutionally protected privacy

We therefore conclude that defendant's utility records were obtained properly through a grand jury subpoena and that the Appellate Division erred in finding that those records were obtained through unconstitutional means.[6]   Because there was no official wrongdoing in acquiring the records, the Appellate Division had no basis to reverse the order denying defendant's motion to suppress or to remand for a determination whether "prior unlawful conduct" tainted the consent search.

### III.

We do not agree with the Appellate Division that the trial court "mistakenly rejected the significance of the fact that the officers, by passing through a gate and entering defendant's backyard, had entered the curtilage of defendant's home without consent, without a warrant and without probable cause." *Domicz, supra,* 377 *N.J.Super.* at 550, 873 *A.2d* 630.   In rendering its decision, the trial court stated that it found Detective Peacock's testimony "to be credible and believable."   In recounting that testimony, the court recalled that Detective Peacock and a fellow officer passed through the rear gate and entered the curtilage for the purpose of knocking on defendant's back door and speaking with him.   The position of the parked cars in defendant's driveway led the officers to believe that the back door was used by residents and visitors.   The detectives did not observe any criminal wrongdoing or contraband before they were called to the front of the house where defendant had answered the door.   Accepting that

---

right in electrical consumption records" under the Washington State Constitution.   *See Maxfield, supra,* 945 *P.2d* at 202 (Madsen, J., concurring);   *id.* at 205–07 (Guy, J., dissenting);   *see also State v. McKinney,* 148 *Wash.*2d 20, 60 *P.*3d 46, 50 (2002) ("A majority of the justices in *Maxfield* held there is no protected privacy interest in power records.").

6 It bears mentioning that based on our review of the record, no information of value was learned by law enforcement by reference to those records.   The State conceded that even with the thermal scan and the utility records it did not have probable cause to secure a warrant to search defendant's home.

explanation as truthful, as the trial court did, there was no unconstitutional incursion of the curtilage of defendant's home.

Curtilage is land adjacent to a home and may include walkways, driveways, and porches. *State v. Johnson*, 171 *N.J.* 192, 208–09, 793 *A.*2d 619 (2002). Whether the Fourth Amendment safeguards an area of curtilage depends on a consideration of various factors, including " 'whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.' " *Ibid.* (quoting *United States v. Dunn*, 480 *U.S.* 294, 301, 107 *S.Ct.* 1134, 1139, 94 *L.Ed.*2d 326, 334–35 (1987)). An area within the curtilage to which the public is welcome, such as a walkway leading to an entrance to a home, is not afforded Fourth Amendment protection because the resident has given implicit consent to visitors to approach the home that way. *See id.* at 209, 793 *A.*2d 619. In other words, when a law enforcement officer walks to a front or back door for the purpose of making contact with a resident and reasonably believes that the door is used by visitors, he is not unconstitutionally trespassing on to the property. *Ibid.* (declaring that " 'when the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go' " the Fourth Amendment is not offended (quoting 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 2.3(f) (3d ed.1996))); *see also United States v. Garcia*, 997 *F.*2d 1273, 1279–80 (9th Cir.1993) (observing that "the Fourth Amendment is not implicated when officers go to the back door reasonably believing it is used as a principal entrance to the dwelling"); *United States v. Reed*, 733 *F.*2d 492, 501 (8th Cir.1984) ("[N]o Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors."); *United States v. Titemore*, 335 *F.Supp.*2d 502, 505–06 (D.Vt.2004) ("[T]he law does not require an officer to determine which door most closely approximates the

Platonic form of 'main entrance' and then, after successfully completing this metaphysical inquiry, approach only that door. An officer making a 'knock and talk' visit may approach any part of the building where uninvited visitors could be expected."), *aff'd*, 437 *F*.3d 251 (2d Cir.2006); *United States v. Daoust*, 728 *F.Supp.* 41, 46 (D.Me.1989) (mem.) ("[P]olice with legitimate business may enter the areas of the curtilage which are impliedly open to use by the public."), *aff'd*, 916 *F*.2d 757 (1st Cir.1990).

In light of the trial court's findings, there was no unconstitutional intrusion onto defendant's property when Detective Peacock and another officer approached the back door. Accordingly, a remand on this issue is unnecessary.

## IV.

### A.

■ We next address the Appellate Division's novel holding that the law enforcement officers in this case had no lawful right to seek consent to search defendant's home unless they had sufficient information "to generate a reasonable and articulable suspicion that criminal activity was occurring within" the residence. *Domicz, supra*, 377 *N.J.Super.* at 551, 873 *A.2d* 630. The panel raised that issue on its own, defendant having failed to raise it at his suppression hearing or before the Appellate Division. Until the panel's decision, no jurisdiction, including our own, had placed such a restriction on the longstanding and universally acknowledged consent exception to the warrant requirement in the context of a home search.[7]

In establishing a reasonable and articulable suspicion standard as a prerequisite to a consent search of a home, the panel

---

[7] Because defendant did not raise the issue below, our dissenting colleagues chide us for addressing it, even though the issue is one of the pillars of a published Appellate Division opinion. *See post* at 315, 907 *A.2d* at 412. We cannot, however, allow to remain standing an erroneous conclusion of law with such far-reaching effects.

extended our limited holding in *State v. Carty*, 170 *N.J.* 632, 635, 790 *A.*2d 903, *modified on other grounds*, 174 *N.J.* 351, 806 *A.*2d 798 (2002), which dealt with the specific problems that had attended motor vehicle stops in this State. We held in *Carty* that Article I, Paragraph 7 of the New Jersey Constitution requires "law enforcement personnel [to] have a reasonable and articulable suspicion of criminal wrongdoing prior to seeking consent to search a lawfully stopped motor vehicle." *Id.* at 635, 790 *A.*2d 903. Our *Carty* decision addressed concerns about the then intractable problem of racial profiling on our highways, *see id.* at 644–45, 790 *A.*2d 903 (citing publications detailing racial profiling), and "the widespread abuse of our existing law that allow[ed] law enforcement officers to obtain consent searches of every motor vehicle stopped for even the most minor traffic violation." *Id.* at 646, 790 *A.*2d 903.

We specifically limited our holding in *Carty* "to consent searches pursuant to a stop for a traffic infraction." *Id.* at 654, 790 *A.*2d 903. "[I]n light of the September 11, 2001 attack on the World Trade Center and the Pentagon," we cautioned against "attempts to overextend our holding in [*Carty*,]" recognizing that "[t]he need to protect public safety today is even more readily apparent than" in earlier times. *Id.* at 652, 654, 790 *A.*2d 903. We noted that our decision did not affect "roadblocks, checkpoints and the like based on a concern for public safety." *Id.* at 652, 790 *A.*2d 903. To accentuate the narrow breadth of the Court's holding, Justice Stein observed in his concurring opinion that it "ha[d] no application to consent searches in airports, bus terminals, train stations, college dormitories, *private homes,* or business premises." *Id.* at 656, 790 *A.*2d 903 (Stein, J., concurring) (emphasis added).

Nonetheless, the panel in this case untethered itself from the factual and jurisprudential moorings of *Carty* and declared in a footnote that "it would be incongruous to view *Carty* as being limited to motor vehicles since intrusion into the privacy of the home is 'the chief evil' that the Fourth Amendment and Article I, paragraph 7 were designed to prevent." *Domicz, supra,* 377

*N.J.Super.* at 551 n. 17, 873 *A.*2d 630. The panel, however, did not have before it a record indicating statistically or even anecdotally that law enforcement officials were indiscriminately misusing the warrant requirement's consent search exception to gain entry into homes. *See Carty, supra,* 170 *N.J.* at 641, 644–45, 790 *A.*2d 903. As noted, before the trial court and Appellate Division, defendant did not claim that such a problem existed. Nor has defendant, amicus curiae, or our dissenting colleagues brought to our attention any evidence (such as research studies, scholarly articles, or periodicals) of law enforcement abuse of the consent exception as it applies to home searches. Because we find no factual or legal justification for such a profound change in our constitutional jurisprudence, we reject the panel's extension of our *Carty* holding to the search of a home.[8]

### B.

█ A search conducted pursuant to consent is a well-established exception to the constitutional requirement that police first secure a warrant based on probable cause before executing a search of a home. *See Schneckloth v. Bustamonte,* 412 *U.S.* 218, 219, 93 *S.Ct.* 2041, 2043–44, 36 *L.Ed.*2d 854, 858 (1973); *Carty, supra,* 170 *N.J.* at 650, 790 *A.*2d 903. Indeed, consent searches are considered a "legitimate aspect of effective police activity." *Schneckloth, supra,* 412 *U.S.* at 228, 93 *S.Ct.* at 2048, 36 *L.Ed.*2d at 863. On the record before us, we do not believe that there are sufficient reasons to alter that longstanding constitutional doctrine. We do not agree with the appellate panel that "it would be incongruous to view *Carty* as being limited to motor vehicles." *Domicz, supra,* 377 *N.J.Super.* at 551 n. 17, 873 *A.*2d 630. First, *Carty* dealt with a problem peculiar to automobiles and disproportionately affecting minority drivers—the indiscriminate abuse of

---

[8] Based on the facts and the carefully limited holding of *Carty,* we do not see how the dissent can conclude that requiring reasonable and articulable suspicion for consent searches of homes is a "clear logical extension of our holding in *Carty." Post* at 320, 907 *A.*2d at 415.

consent searches of cars whose operators had been stopped for minor traffic infractions. *Carty, supra,* 170 *N.J.* at 644–47, 790 *A.*2d 903. Here, there is no claim by defendant or amicus curiae that there is a problem of misuse of consent searches of homes or that minority residents are disproportionately targeted by such searches.

Second, we perceive that there is a greater degree of compulsion to accede to a consent search when a motorist is stranded on a highway after a motor vehicle stop for a minor traffic infraction and the detaining police officer requests permission to search than when a person is secure in his own home and not under any form of detention and a similar request is made. *See Carty, supra,* 170 *N.J.* at 644, 790 *A.*2d 903 ("In the context of motor vehicle stops, where the individual is at the side of the road and confronted by a uniformed officer seeking to search his or her vehicle, it is not a stretch of the imagination to assume that the individual feels compelled to consent."). In *Carty,* we described the inherently coercive predicament of the driver who is stopped on the highway and faced with the perceived choice of either refusing consent to search and therefore increasing the likelihood of receiving a traffic summons, or giving consent to search in the hope of escaping with only a warning. *Id.* at 641, 790 *A.*2d 903.

The choices are not so stark for the person who, in the familiar surroundings of his home, can send the police away without fear of immediate repercussions. *See Schneckloth, supra,* 412 *U.S.* at 247, 93 *S.Ct.* at 2058, 36 *L.Ed.*2d at 874 (suggesting that consent searches are not "inherently coercive" when they "occur on a person's own familiar territory"); *United States v. Carter,* 378 *F.*3d 584, 589 (6th Cir.2004) (stating that "a man's home is his castle," and that "police may be kept out or invited in as informally as any other guest"), *cert. denied,* 543 *U.S.* 1155, 125 *S.Ct.* 1298, 161 *L.Ed.*2d 121 (2005); *cf. State v. Timmendequas,* 161 *N.J.* 515, 615, 737 *A.*2d 55 (1999) (stating that, because questioning of defendant took place in his home, it "was not inherently intimidating"), *cert. denied,* 534 *U.S.* 858, 122 *S.Ct.* 136, 151 *L.Ed.*2d 89

(2001); *State v. P.Z.*, 152 *N.J.* 86, 103, 703 *A.*2d 901 (1997) (noting that, during interview of defendant in his home, he had "complete freedom to come and go as he pleased"). In limiting the reach of our holding in *Carty*, we recognized the distinct disadvantage of the motorist detained at the side of the road and the history of abuse of the consent search in the context of motor vehicle stops. *Carty, supra*, 170 *N.J.* at 641, 644, 646, 790 *A.*2d 903.

That is not to say that a person will not feel some degree of compulsion whenever a police officer makes a request. *See State v. McCloskey*, 90 *N.J.* 18, 24, 446 *A.*2d 1201 (1982); *State v. Hickman*, 335 *N.J.Super.* 623, 633, 763 *A.*2d 330 (App.Div.2000). Surely, during a field inquiry, when a police officer asks a question of a person on the street, although that person is lawfully free to leave, he may feel some compulsion to respond. Nonetheless, we do not mandate that police officers have reasonable suspicion before making an inquiry. *See State v. Maryland*, 167 *N.J.* 471, 484, 771 *A.*2d 1220 (2001). Under our State Constitution, we have heightened requirements to ensure that the waiver of the right to refuse a consent search is voluntarily and knowingly exercised. In *State v. Johnson*, we held that under Article I, Paragraph 7, if "the State seeks to justify a search on the basis of consent it has the burden of showing that the consent was voluntary, an essential element of which is knowledge of the right to refuse consent." 68 *N.J.* 349, 353–54, 346 *A.*2d 66 (1975). Indeed, New Jersey is one of a small minority of jurisdictions in the country requiring the State to prove, as a precondition to the validity of a consent search, that a person have knowledge of his right to refuse to give consent. *See State v. Brown*, 356 *Ark.* 460, 156 *S.W.*3d 722, 724 (2004) (holding that "a home dweller must be advised of his or her right to refuse consent in order to validate a consensual search under the Arkansas Constitution"); *State v. Ferrier*, 136 *Wash.*2d 103, 960 *P.*2d 927, 934 (1998) (holding that police "must, prior to entering the home, inform the person from whom consent is sought that he or she may lawfully refuse to consent to the search"). Detective Peacock did in this case what police officers

routinely do throughout the State—he advised defendant that he had a right to refuse to give consent to a search of his home.

Mandating that police officers have reasonable and articulable suspicion to believe that criminal activity is afoot in a home before they can make a request to search the residence will not dispel whatever compulsion a person might feel when confronted by authority figures at his door; certainly the same compulsion would be felt by the person if the officers had reasonable suspicion. The reasonable suspicion standard, however, will limit consent searches to a much smaller universe of cases. In the dangerous times in which we live, we have not been presented with any compelling reason—such as the record of abuse presented in *Carty*—to restrict law enforcement officers in a way that no other jurisdiction has done to date.

■ As articulated in our case law, to determine whether a person's consent was voluntarily given or coerced, the proper analytical framework is whether a person has knowingly waived his right to refuse to consent to the search. *See Johnson, supra,* 68 *N.J.* at 353–54, 346 *A.*2d 66 (establishing standard of voluntariness of consent under Article I, Paragraph 7, as knowing and intelligent waiver, which includes knowledge of right to refuse consent); *State v. King,* 44 *N.J.* 346, 352–53, 209 *A.*2d 110 (1965) (setting forth various non-exhaustive factors supporting either voluntary or coerced nature of consent). Free choice remains an indispensable tenet of our law—for example, the choice to submit to interrogation or to consent to a search. *See Miranda v. Arizona,* 384 *U.S.* 436, 444, 86 *S.Ct.* 1602, 1612, 16 *L.Ed.*2d 694, 707 (1966); *Johnson, supra,* 68 *N.J.* at 355, 346 *A.*2d 66 (Schreiber, J., concurring) ("Consent contemplates the exercise of a choice" and free choice is "effectively safeguarded if the occupant of the premises knows that the search may be refused."); *see also King, supra,* 44 *N.J.* at 353, 209 *A.*2d 110 (noting that "many decisions have sustained a finding that consent was voluntarily given even though the consent was obtained under the authority of the badge or after the accused had been arrested"). The Consti-

tution protects against unreasonable searches and seizures and against coerced waivers of constitutional rights. It does not disallow voluntary cooperation with the police.

Our dissenting colleagues claim that a "knock and talk" encounter between police and a citizen at his or her home is "coercive," *post* at 319–20, 907 *A*.2d at 415, despite the *Johnson* warnings. That position undermines the very essence of *Johnson,* which is predicated on the principle that informed and voluntary consent is not coerced consent. Moreover, our dissenting colleagues have failed to explain how, under their construct, a "knock and talk" encounter is any less "coercive" if based on reasonable and articulable suspicion. The dissent apparently would allow for the search of defendant's home, despite a coerced consent to search, provided there is reasonable and articulable suspicion for the search.

In this case, after presiding over the suppression hearing, the trial court determined that the State had proven by clear and convincing evidence that defendant knowingly and voluntarily gave consent to the police to search his home. The positions of the parties were hotly contested and the accounts given by Detective Peacock and defendant were so different and discordant that only one could be telling the truth. The trial court had the " 'feel' of the case," the opportunity to make observations of the witnesses denied to an appellate court. *State v. Locurto,* 157 *N.J.* 463, 471, 724 *A*.2d 234 (1999) (quoting *State v. Johnson,* 42 *N.J.* 146, 161, 199 *A*.2d 809 (1964)). Ultimately, the court found Detective Peacock credible. Defendant does not challenge the sufficiency of the evidence to support that conclusion on the present record. *See Johnson, supra,* 42 *N.J.* at 162, 199 *A*.2d 809 (stating that aim of appellate review is "to determine whether the findings made could reasonably have been reached on sufficient credible evidence present in the record").

For the reasons discussed, we decline to extend *Carty* to require that the police have a reasonable and articulable suspicion

of criminal activity in a home to justify requesting consent to conduct a search of the premises.

## V.

At the suppression hearing, to bolster his credibility, defendant attempted to introduce testimony about the results of an unstipulated private polygraph test he took in his lawyer's office eighteen months after the search of his home.[9]  Defendant called to the stand Alan Hart, Ph.D., a polygraph examiner, who conducted the polygraph examination and who, according to his report, was prepared to testify that defendant "demonstrated no reactions indicative of deception" when responding to three questions concerning the events surrounding the search of his home. In response to one such question, defendant denied that "any police officer [told him] that [he] could refuse [the] search." [10] The State received Dr. Hart's report four days before the suppression hearing.

The trial court declared Dr. Hart's testimony irrelevant and barred him from testifying, presumably based on this Court's decision in *State v. McDavitt*, 62 *N.J.* 36, 46, 297 *A.*2d 849 (1972), in which we held that the results of a polygraph examination are admissible only "in a criminal case when the State and defendant enter into a stipulation to have defendant submit to a polygraph

---

[9] By measuring "respiration, pulse rate and blood pressure, and galvanic skin response," polygraph examinations are used to determine whether a person is telling the truth as that person is asked and answers questions.  31 Leonard N. Arnold, New Jersey Practice Series: Criminal Practice and Procedure § 1.41, at 59 (2005).

[10] Defendant also showed "no reactions indicative of deception" when answering the following questions affirmatively: "Did the police announce 'State police—we have a search warrant' when they came to your door on July 27, 2000?" and "When you signed that paper on July 27, 2000, did you believe the police had a search warrant?"  The results of the examination were inconclusive with regard to the question: "Did you invite the police into your house in Williamstown on July 27, 2000?"

test." The court asserted that determining credibility was the motion judge's function.

The Appellate Division concluded that the trial court erred by completely excluding the polygraph evidence at the suppression hearing. *Domicz, supra,* 377 *N.J.Super.* at 556, 873 *A.*2d 630. The panel distinguished the jury trial case in *McDavitt,* which restricted the admissibility of polygraph examinations to criminal cases involving stipulations between the State and the defendant, from the suppression hearing in this case, in which defendant intended to introduce his unstipulated polygraph examination to a judge. *Id.* at 559, 873 *A.*2d 630. The panel held that "in a non-jury setting the admission of [polygraph] evidence, when a proper foundation has been laid, is not limited by *McDavitt's* stipulation requirement." *Id.* at 558, 873 *A.*2d 630. The panel maintained that "[t]he judge may give that testimony such weight as it warrants, but the extent to which the judge values that evidence should not determine its admissibility." *Id.* at 560, 873 *A.*2d 630. The panel, however, conceded that "the State would be entitled to offer the same type of evidence" and that its ruling could "turn some suppression hearings, where credibility is a central issue, into battles between polygraphers." *Id.* at 560 n. 19, 873 *A.*2d 630.

Defendant and the State dispute the reliability and therefore the relevance of the results of an unstipulated polygraph examination sought to be introduced at a suppression hearing. Defendant essentially argues that if the results of a stipulated examination are sufficiently reliable for a jury's consideration, results from an unstipulated examination surely must be reliable enough for a judge's consideration at a motion hearing. The State stresses that *McDavitt* was a singular exception to the general rule that polygraph evidence is inadmissible, emphasizing that with a stipulated polygraph examination it is "the stipulation between the State and defendant" that confers "probative value" on the polygraph evidence.

First, it must be mentioned that defendant did not seek to present to the trial court evidence that the overall reliability of

polygraph examinations has achieved significantly greater acceptance in the scientific and legal community since our decision in *McDavitt.* The Court acknowledged in *McDavitt* the general rule that "lie detector testing has not yet attained scientific acceptance as a reliable and accurate means of ascertaining truth or deception." 62 *N.J.* at 44, 297 *A.*2d 849. In that case, the Court carved out a narrow exception to that rule, holding that "[p]olygraph testing has sufficient probative value to warrant admissibility" only when both the State and the defendant agree to be bound by the results. *Id.* at 46, 297 *A.*2d 849. Thus, limited to a criminal case involving a stipulation between the parties, the Court concluded that "polygraph testing has been developed to such a point of reliability" to allow the admissibility of the results. *Ibid.*

It is instructive to note that the "circumstance under which the stipulation came into existence [in *McDavitt* ]" was "a consideration" for the Court in deciding that case. *Id.* at 45, 297 *A.*2d 849. In a criminal jury trial, the defendant in *McDavitt,* over the prosecutor's objection, testified that he offered to submit to a polygraph examination after his burglary arrest. *Id.* at 41, 297 *A.*2d 849. That testimony, this Court noted, should not have been permitted. *Id.* at 43, 297 *A.*2d 849. But the door was opened. On cross-examination, in response to a question by the prosecutor, the defendant stated he would be willing to take a polygraph test that day. *Id.* at 41, 297 *A.*2d 849. Eventually, the defendant and the State entered into a court-approved stipulation, agreeing to the admissibility of the results of a polygraph test. *Id.* at 41–42, 297 *A.*2d 849. Unfortunately for the defendant, the examiner found him to be untruthful. *Id.* at 42–43, 297 *A.*2d 849. From those unusual facts was born the *McDavitt* exception.

There is a lack of scientific consensus concerning the reliability of polygraph evidence, which in turn is reflected in the disagreement among state and federal courts concerning the admissibility of such evidence. *United States v. Scheffer,* 523 *U.S.* 303, 309–12, 118 *S.Ct.* 1261, 1265–66, 140 *L.Ed.*2d 413, 419–21 (1998). In criminal cases, either in a jury or non-jury setting, the vast

majority of states either ban polygraph evidence altogether or do not admit such evidence absent a stipulation between the State and the defendant. *See* Am. Polygraph Ass'n, *Polygraph: Quick Reference Guide to the Law* iii (17th ed.2002) (noting that eighteen states require stipulation as precondition of admission and that thirty-one states either ban polygraph evidence per se or have not yet addressed issue), *available at* http://www.polygraph.org/intro.htm. To our knowledge, New Mexico is the only state in which polygraph evidence is admissible without significant restriction in criminal trials, even absent a stipulation between the parties. *See Lee v. Martinez*, 136 *N.M.* 166, 96 *P.*3d 291, 303 (2004); *Scheffer, supra*, 523 *U.S.* at 311–12, 118 *S.Ct.* at 1266, 140 *L.Ed.*2d at 420 (citing *N.M. Rule Evid.* § 11–707).[11] Today, both "state and federal courts continue to express doubt about whether [polygraph] evidence is reliable." *Scheffer, supra*, 523 *U.S.* at 312, 118 *S.Ct.* at 1266, 140 *L.Ed.*2d at 420; *see also United States v. Catalan–Roman*, 368 *F.Supp.*2d 119, 123 (D.P.R.2005); *United States v. Canter*, 338 *F.Supp.*2d 460, 463–64 (S.D.N.Y.2004); *see generally* Am. Polygraph Ass'n, *supra.* In the more than thirty years since *McDavitt*, serious questions about the reliability of polygraph evidence remain.

We realize that some may question the very premise of *McDavitt*, that polygraph test evidence can be reliable in some circumstances and for some purposes but not others. This is not the occasion to revisit *McDavitt's* narrow holding. On the record before us, we are not prepared to extend *McDavitt* to unstipulated polygraph examinations, even in a suppression hearing presided over by a judge. We are confident that our judges are capable of making credibility decisions in the traditional way, by assessing the logic and sense of the testimony and the manner in which the

---

[11] *See also State v. Barbara*, 400 *Mich.* 352, 255 *N.W.*2d 171, 173 (1977) (permitting, at judge's discretion, admission of polygraph evidence on postconviction motions for new trial); *State v. McHoney*, 344 *S.C.* 85, 544 *S.E.*2d 30, 35 (2001) (declaring that polygraph evidence is subject to general rules of evidence but is "generally inadmissible").

witness testifies. *See Locurto, supra,* 157 *N.J.* at 474, 724 *A.*2d 234. That approach is not fool proof, for whenever human judgment comes into play there is the potential for error, but we are not convinced that polygraph evidence is likely to lead to more correct outcomes.

We also do not believe that the paradigm proposed by the Appellate Division is workable, even in a non-jury setting. If a defendant sought to introduce the results of a private polygraph examination, then the State would have to be given the opportunity to conduct its own polygraph test of the defendant. *Cf. State v. Whitlow,* 45 *N.J.* 3, 24–25, 210 *A.*2d 763 (1965) (stating that when defendant presents insanity defense through psychiatric testimony he is subject to examination by State's psychiatrists); *State v. Myers,* 239 *N.J.Super.* 158, 169–70, 570 *A.*2d 1260 (App.Div.1990) (stating that State is entitled to examine defendant who raises defense of insanity or diminished capacity as response "to the anticipated testimony of defendant's experts on the same subject"), *certif. denied,* 127 *N.J.* 323, 604 *A.*2d 598 (1990). Moreover, the Appellate Division admitted that under its approach the State would be permitted to give its witness a polygraph test, and then presumably the defendant would want his polygraph expert to examine that witness. And if the outcome of the case hinged on the credibility of other witnesses, more polygraph examinations likely would follow, leading to the absurd situation of the judge determining the credibility of the experts who are opining about the truthfulness of the witnesses. We will not sanction a war of the experts in an area in which there is so much uncertainty concerning the reliability of the testing procedure itself and which distracts the judge from fulfilling his essential function of assessing directly the credibility of the witnesses.

## VI.

For the reasons given, we reverse the decision of the Appellate Division and reinstate the judgment of conviction.

Justices LaVECCHIA, ZAZZALI and RIVERA–SOTO join in Justice ALBIN's opinion. Justice WALLACE filed a separate opinion concurring in part and dissenting in part in which Chief Justice PORITZ and Justice LONG join.

Justice WALLACE, JR., concurring and dissenting.

In my view, the Court is not required to address the difficult issue of whether the reasonable and articulable suspicion standard is a prerequisite to a consent search of a home. Defendant did not raise that issue at his suppression hearing or before the Appellate Division. We have frequently "expressed our reluctance to decide issues that were not addressed in the trial court or the Appellate Division." *Gac v. Gac,* 186 *N.J.* 535, 547, 897 *A.*2d 1018 (2006). Moreover, "[w]e have applied that principle even when a constitutional issue is presented." *Ibid.* Although the majority opinion recognizes that the issue of the standard for a consent search of a home was not raised below, it nevertheless decides the issue. Because I disagree with the majority's disposition, I dissent from the conclusion that police are not required to have a reasonable and articulable suspicion of criminal activity in a home before seeking a consent search.

Similar to the Fourth Amendment to the United States Constitution, the New Jersey Constitution prohibits unreasonable searches and seizures. *N.J. Const.* art. I, ¶ 7. "A warrantless search is presumed invalid unless it falls within one of the recognized exceptions to the warrant requirement." *State v. Cooke,* 163 *N.J.* 657, 664, 751 *A.*2d 92 (2000) (citing *State v. Alston,* 88 *N.J.* 211, 230, 440 *A.*2d 1311 (1981)). The State has the burden of establishing that a warrantless search falls within one of the recognized exceptions. *Ibid.* In the present case the State urges that the warrantless search of defendant's home was valid under the consent-search exception. *See Schneckloth v. Bustamonte,* 412 *U.S.* 218, 280, 93 *S.Ct.* 2041, 2075, 36 *L.Ed.*2d 854, 893 (1973).

We have interpreted Article I, paragraph 7 of the State Constitution to provide enhanced protections beyond that of the Fourth

Amendment. *See, e.g., State v. Eckel,* 185 *N.J.* 523, 524, 538, 888 *A.*2d 1266 (2006) (holding New Jersey Constitution prohibits search of auto incident to arrest where occupant removed from vehicle and secured elsewhere); *State v. McAllister,* 184 *N.J.* 17, 33, 875 *A.*2d 866 (2005) (finding legitimate expectation of privacy in bank records under State Constitution in contrast to Federal Constitution); *State v. Pierce,* 136 *N.J.* 184, 215, 642 *A.*2d 947 (1994) (invalidating warrantless vehicular search based on arrest for motor vehicle offense); *State v. Tucker,* 136 *N.J.* 158, 166–70, 642 *A.*2d 401 (1994) (holding that in contrast with Fourth Amendment, New Jersey Constitution prohibits police from stopping defendant solely because of flight upon seeing police); *State v. Hempele,* 120 *N.J.* 182, 195–215, 576 *A.*2d 793 (1990) (holding warrantless searches of garbage bags left on curb for collection invalid under State Constitution); *State v. Novembrino,* 105 *N.J.* 95, 145–58, 519 *A.*2d 820 (1987) (rejecting under State Constitution federal "good faith" exception to exclusionary rule for search warrants issued in good faith but without probable cause); *State v. Hunt,* 91 *N.J.* 338, 350, 450 *A.*2d 952 (1982) (holding State Constitution affords protectable interest in telephone toll billing records); *Alston, supra,* at 224–30, 440 *A.*2d 1311 (recognizing possessory interest in property sufficient to confer standing under State Constitution to challenge validity of vehicle search); *State v. Johnson,* 68 *N.J.* 349, 353–54, 346 *A.*2d 66 (1975) (holding under State Constitution that validity of consent search requires knowledge of right to refuse consent).

Specifically, our consent-search jurisprudence requires the police to inform the person from whom consent is sought of the right to refuse consent. That requirement is not provided under the Federal Constitution. In *Schneckloth, supra,* the United States Supreme Court held that a consent to search need only be voluntary and whether the defendant knew of the right to refuse consent is only one of the factors to be considered in evaluating the totality of circumstances to determine whether the consent was voluntary. 412 *U.S.* at 227, 93 *S.Ct.* at 2047–48, 36 *L.Ed.*2d at 862–63. In *Johnson, supra,* we added to those requirements and

held that the validity of a consent to search requires proof that the defendant had "knowledge of the right to refuse consent." 68 *N.J.* at 354, 346 *A.*2d 66. We recognized that "[m]any persons, perhaps most, would view the request of a police officer to make a search as having the force of law." *Ibid.* As a result, we concluded that "[u]nless it is shown by the State that the person involved knew that he had the right to refuse to accede to such a request [for a consent search], his assenting to the search is not meaningful." *Ibid.*

At least one other jurisdiction has followed *Johnson* and expanded upon the protective procedures for a valid consent to search a home. In *State v. Ferrier*, 136 *Wash.*2d 103, 960 *P.*2d 927, 928 (1998), the Supreme Court of Washington addressed a fact pattern analogous to the present case. There the police received information that the defendant was growing marijuana in her home and planned to conduct a "knock and talk." [1] *Ibid.* One of three officers who testified at the suppression hearing indicated that almost everyone subject to a "knock and talk" lets the police into their homes. *Ibid.* Four officers went to the defendant's home, two in the front and two in the back to secure the premises. *Ibid.* After the defendant opened the front door and invited the two officers inside, the two remaining officers were let inside the home. *Ibid.* The police explained that they had information the defendant was growing marijuana and asked for consent to search the home. *Id.* at 929. They read the consent form to the defendant, who signed it. *Ibid.* The search of the home revealed numerous marijuana plants. *Ibid.* Subsequently, the defendant moved to suppress the evidence. *Ibid.* In invalidating the search, the court declared that "any knock and talk is inherently coercive to some degree," *id.* at 933, and "the home receives heightened constitutional protection," *id.* at 934 (quoting *State v. Young*,

---

[1] A "knock and talk" occurs when the police knock on the door, make contact with the resident, ask if they may enter to talk about their concern, and once inside, ask permission to search the premises.

123 *Wash.*2d 173, 867 *P.*2d 593, 599 (1994)). As a result, the court held that

> when police officers conduct a knock and talk for the purpose of obtaining consent to search a home, and thereby avoid the necessity of obtaining a warrant, they must, *prior to entering the home,* inform the person from whom consent is sought that he or she may lawfully refuse to consent to the search and that they can revoke, at any time, the consent that they give, and can limit the scope of the consent to certain areas of the home. The failure to provide these warnings, *prior to entering the home,* vitiates any consent given thereafter.
> [*Ibid.* (emphasis added).]

Recently, in the context of a motor vehicle stop, we expanded the requirements for a consent search. In *State v. Carty,* 170 *N.J.* 632, 647, 790 *A.*2d 903, *modified on other grounds,* 174 *N.J.* 351, 806 *A.*2d 798 (2002), we affirmed the judgment of the Appellate Division "that consent searches following a lawful stop of a motor vehicle should not be deemed valid under *Johnson* unless there is reasonable and articulable suspicion to believe that an errant motorist or passenger has engaged in, or is about to engage in, criminal activity." In explaining the need for a modification of the *Johnson* standard, we emphasized that our review of scholarly articles, cases from other jurisdictions, and the empirical data available, demonstrated

> that despite use of the first-tell-then-ask rule or the voluntary and knowing standard adopted in *Johnson,* consent searches following valid motor vehicle stops are either not voluntary because people feel compelled to consent for various reasons, or are not reasonable because of the detention associated with obtaining and executing the consent search.
> [*Id.* at 646, 790 *A.*2d 903.]

In the present case, the Appellate Division concluded that the standard we applied to motor vehicles in *Carty* must apply to the home. *State v. Domicz,* 377 *N.J.Super.* 515, 551 n. 17, 873 *A.*2d 630 (2005). The panel reasoned that "it would be incongruous to view *Carty* as being limited to motor vehicles since intrusion into the privacy of the home is 'the chief evil' that the Fourth Amendment and Article I, paragraph 7 were designed to prevent." *Ibid.* I agree.

We provide greater protections against unreasonable searches and seizures of the home than for other encounters. As expressed

by one court, " '[a]n individual's privacy interests are nowhere more clearly defined or rigorously protected by the courts than in the home[,] the core of fourth amendment rights.' " *Kornegay v. Cottingham*, 120 *F*.3d 392, 399–400 (3d Cir.1997) (quoting *Wanger v. Bonner*, 621 *F*.2d 675, 681 (5th Cir.1980)). We have emphasized that "[t]here is a lesser expectation of privacy in one's automobile and in one's office, than in one's home." *State v. Johnson*, 168 *N.J.* 608, 625, 775 *A*.2d 1273 (2001) (citations omitted); *see also State v. Stott*, 171 *N.J.* 343, 355, 794 *A*.2d 120 (2002) (noting that "hospital room is more akin to one's home than to one's car or office" in invalidating warrantless search of hospital room). It naturally follows that whatever protections pertain to an automobile search, at a minimum, they must apply to a home.

In refusing to apply the reasonable and articulable suspicion standard to the consent search of the home, the majority overlooks the express limitation of the holding in *Carty* that was directed to the motor vehicle context. Justice Coleman explained that

[t]o avoid confusion in attempts to overextend our holding in this case in light of the September 11, 2001 attack on the World Trade Center and the Pentagon, we wish to make clear the limitations of this opinion. This decision does not affect the principles enunciated in various state and federal cases that allow roadblocks, checkpoints and the like based on a concern for the public safety.

[*Carty, supra*, 170 *N.J.* at 652, 790 *A*.2d 903.]

In short, *Carty* did not place a restriction on the application of its holding to the private home but rather expressed the Court's concern that it not be extended to "roadblocks, checkpoints and the like."

Further, I disagree with the majority's conclusion that police presence at a home is not coercive. On the contrary, I believe a "knock and talk," like the one at issue involving numerous officers attempting to enter the home at both means of egress, suffers from at least the same infirmities identified in *Carty*. *See* Adrian J. Barrio, Note, *Rethinking Schneckloth v. Bustamonte: Incorporating Obedience Theory into the Supreme Court's Conception of Voluntary Consent*, 1997 *U. Ill. L.Rev.* 215, 218 ("consent searches

contain inherently compelling pressures that threaten the exercise of valuable privacy right"). Until today, the application of our consent-search jurisprudence, including the clear logical extension of our holding in *Carty,* would require that we extend to the house the reasonable and articulable suspicion standard that we apply to consent searches of automobiles. *See also State v. Rodriguez,* 172 *N.J.* 117, 132, 796 *A.*2d 857 (2002) (ordering suppression of evidence seized in consent search not supported by reasonable and articulable suspicion because "illegal detention voids the consent").

I would also follow the approach of the Supreme Court of Washington and rule that in the future, when the police have reasonable and articulable suspicion to request a consent search, that before they enter the premises, they must make the request for the search and explain the right to refuse and to stop the search at any time. *See Ferrier, supra,* 960 *P.*2d at 934.

I would affirm that part of the Appellate Division judgment remanding the case to the Law Division for a hearing to determine whether the police had reasonable and articulable suspicion of criminal activity to request a valid consent search. In all other respects, I concur in the opinion of the Court.

Chief Justice PORITZ and Justice LONG join in this opinion.

*For reversal and reinstatement*—Justices LaVECCHIA, ZAZZALI, ALBIN and RIVERA-SOTO—4.

*For concurrence in part/dissent in part*—Chief Justice PORITZ and Justices LONG and WALLACE—3.