NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2838-16T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

SIWAN R. BROWN, a/k/a
SHAWN BROWN,

    Defendant-Appellant.

_____

Argued November 26, 2018 – Decided December 27, 2018

Before Judges Sabatino, Sumners and Mitterhoff.

On appeal from Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 15-09-1253.

Daniel S. Rockoff, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Daniel S. Rockoff, of counsel and on the brief).

Lila B. Leonard, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Lila B. Leonard, of counsel and on the briefs).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

Tried by a jury, defendant Siwan R. Brown was found guilty of various drug offenses. The State's case was largely based on the seizure of over one thousand bags of heroin and other drug paraphernalia from a residence that defendant shared with other relatives.

Among other things, defendant argues on appeal the trial court erred in declining the jury's request during their deliberations to have the court play back defense counsel's closing argument for them. The court denied that request on the basis that, as the Model Criminal Jury Charges state, the summations of counsel do not comprise evidence. The propriety of granting such a playback request from jurors has not been addressed before in any published New Jersey opinion, although the issue has arisen in case law from a few other jurisdictions.

For the reasons that follow, we hold that trial courts in our State have the discretion in appropriate circumstances to grant jury requests to have the closing arguments of all counsel played back or read back to them, in full or in part. In recognizing that discretionary authority, we follow other jurisdictions that have acknowledged the discretion of judges to allow such playbacks or readbacks. We reject, however, defendant's contention that the denial of the jury's playback request in his own case was unduly prejudicial and requires a new trial.

In the unpublished portion of this opinion, we affirm the trial court's pretrial ruling to admit incriminating statements that defendant made to police

2

officers after they stopped his car for a traffic violation and smelled marijuana. However, with the State's acquiescence, we remand this case to the trial court to reevaluate, under the multi-factor voluntariness test of State v. King, 44 N.J. 346 (1965), whether the police obtained defendant's valid consent to search his residence after the motor vehicle stop. We also remand this matter for the trial court to reevaluate whether the police had a sufficient lawful basis at the time of the motor vehicle stop to request defendant's consent to search his residence.

I.

This prosecution of defendant arose out of the following circumstances. We detail in particular the facts and allegations relating to the search of defendant's car and his residence.

A.

The Car Stop

At about 8:00 p.m. on April 30, 2015, Jersey City police officers Dennis DeJesus and Gabe Moreano observed a white Ford Taurus fail to stop at a stop sign. The officers pulled over the Taurus. Defendant, the Taurus driver, lowered the windows. A female, later identified as defendant's aunt, was next to him in the passenger's seat. Officer DeJesus approached the car on the passenger side and Officer Moreano approached on the driver's side. Defendant rolled down his window and Moreano asked him to produce his documentation.

3

According to the officers' testimony, once defendant rolled down the windows, they immediately smelled the odor of raw marijuana emanating from the car. Moreano asked defendant about the smell of marijuana. Defendant admitted to Moreano he had smoked marijuana earlier that day.

Moreano then asked defendant to step out of the vehicle. As defendant began to do so, Moreano asked him, "if he ha[d] anything on him . . . that could poke me, stab me, anything that could cause me harm." According to Moreano, defendant replied, "Yeah, I have two bundles on me." Moreano's partner, Officer DeJesus, testified that, based on his training and experience, he understood this comment to mean defendant had two bundles of heroin on his person. Defendant told Moreano the heroin was in his right-side back pocket.

Officer Moreano retrieved the two bundles from defendant's pants pocket. Each bundle contained ten small bags of heroin.

The police then placed defendant under arrest, handcuffed him, and read him a <u>Miranda</u> warning.[1] The officers searched defendant's person incident to his arrest and seized his keys. The officers also searched the aunt, but found no contraband.

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

A-2838-16T1

The Car Search

The officers then asked defendant if he would be willing to consent to a search of his car. Defendant denied there was any contraband in the car, but nevertheless agreed to the car search. Defendant signed a consent form, reflecting his agreement. The police then searched the car and recovered a clear plastic bag of marijuana from the center console.

The aunt called her brother (defendant's uncle), who lived about ten blocks away. The uncle arrived and sought to drive the Taurus away so it would not be towed. However, the officers would not release the vehicle to him.

Meanwhile, a police sergeant arrived at the scene. After witnessing defendant sign the form consenting the search of the car, the sergeant asked defendant if he had any more narcotics at his residence. Defendant said no. The sergeant then asked defendant if he would consent to a search of his residence. According to the police testimony, defendant orally consented.

The Home Search

The police drove defendant, who was still in handcuffs, in a patrol car to his residence on Armstrong Avenue where he resided with his uncle and cousin. The police separately drove the Taurus back to the home as well. In the meantime, defendant's uncle returned to the residence and met the officers at the

5

door. The uncle opened the door.[2] The officers escorted defendant into the residence, and they went into the kitchen. Defendant's uncle was present in the apartment for the entirety of the search.

The officers briefly removed defendant's handcuffs and, at 8:47 p.m., he signed a consent form. The word "room" was handwritten in parentheses next to defendant's signature.

Once the consent form was signed, officers used a key that was on defendant's key ring to unlock what defendant had initially identified as his bedroom. The officers had difficulty unlocking the door. Concerned that they would break the key or the lock, the officers had defendant unlock the bedroom door. The officers removed one of defendant's handcuffs, and he opened the lock. The officers then searched the room in defendant's presence.

Once inside the room, the officers noticed a mattress on the floor, clothes strewn about, and stacks of storage bins. After searching this room, the officers seized numerous items of drug paraphernalia, including empty vials and empty bags. The police did not find any drugs in that room.

The police then asked defendant if that was truly his room, or whether there were other rooms he used. Defendant replied that he did not use any other

---

[2] Defendant has not contested the uncle's authority to let the officers inside the shared residence.

6

rooms. Officers then asked the uncle if there were any other rooms defendant used. The uncle pointed to another room and advised it was defendant's bedroom as well. The police asked defendant if this second room was also his, and he acknowledged that it was.

The police once again temporarily removed defendant's handcuffs. They handed him the key ring, and defendant unlocked the second bedroom. The officers searched the bedroom and found more drug paraphernalia, including a plate with a razor that had drug residue, empty vials, and empty bags. Again, no drugs were found.

The Search of the Safe

After the police had discovered a considerable amount drug paraphernalia, an officer asked defendant, "Where's the narcotics?" Defendant replied that there were no drugs in the house.

Meanwhile, Officer DeJesus spoke separately with the uncle, who orally agreed to let the police search a third bedroom. Inside that third bedroom the police discovered a black safe. The officers questioned defendant and the uncle about the contents of the safe. The uncle said he had not known that a safe was in that bedroom, and he denied owning it. The officers then asked defendant if he owned the safe. Initially, he denied owning it, but then eventually conceded the safe was his.

7

Officer DeJesus asked defendant what was in the safe. According to DeJesus, defendant replied, "Whatever you find in there . . . then that's really it . . . there's no gun, nothing else in the house."

At about 9:40 p.m., defendant signed another consent-to-search form, this one authorizing the search of the safe. The police opened the safe and found 1,050 bags of heroin, divided into twenty-one bricks. The heroin in the safe had the same logo as the heroin found earlier in defendant's pocket.

B.

The Indictment

Based on this evidence, a Hudson County grand jury charged defendant with multiple crimes. The charges included first-degree operation of a facility for manufacturing heroin, N.J.S.A. 2C:35-4 (count one); second-degree possession of heroin with intent to distribute, N.J.S.A. 2C:35-5(a)(l) and N.J.S.A. 2C:35-5(b)(2) (count two); third-degree possession of heroin with intent to distribute while within 1,000 feet of school property, N.J.S.A. 2C:35-7 (count three); second-degree possession of heroin with intent to distribute while within 500 feet of a public park, N.J.S.A. 2C:35-7.l (count four); third-degree possession of heroin, N.J.S.A. 2C:35-10(a)(l) (counts five and six); and fourth-degree possession of drug paraphernalia with intent to distribute, N.J.S.A. 2C:36-3 (count seven).

A-2838-16T1

## C.

<u>The Pretrial Suppression Motions</u>

Prior to trial, defendant filed a series of suppression motions. First, he moved to suppress the physical evidence, including the drugs and drug paraphernalia, which the police had seized from his residence without a warrant. After a two-day hearing, the motion judge denied that application, issuing a detailed written opinion. In essence, the judge concluded that defendant had voluntarily provided his consent, both orally and in written form, to search the two rooms and the safe.

Thereafter, defendant moved to suppress the oral statements he made to the police at the scene of the motor vehicle stop <u>before</u> the <u>Miranda</u> warning had been given, including his admission that he had the "two bundles" on his person. The motion judge denied this application as well. In his oral opinion, the judge concluded defendant was not yet in custody when he made these statements, and thus no <u>Miranda</u> violation occurred.

The case was taken over by a second judge ("the trial judge"). Defendant moved before that judge to suppress the statements he made to the police <u>after</u> he was read his <u>Miranda</u> rights. The trial judge granted this motion, finding no valid waiver of defendant's rights against self-incrimination as to the post-

9

warning statements. Consequently, those statements were excluded from the State's evidence at trial.

D.

The Trial and Verdict

The case was tried over the course of several days in September 2016. The State presented testimony from several police officers who had been involved in the arrest and search, a forensic chemist who tested the drugs, and a narcotics expert. Defendant did not testify in his own behalf, but he presented testimony from his aunt who had been the passenger in the Taurus. The defense's theme at trial suggested that someone else other than defendant owned the drugs and paraphernalia found within the residence.

On the second day of their deliberations, the jurors found defendant not guilty of the first-degree manufacturing charge, but guilty on the remaining counts in the indictment.

Sentencing

The trial judge imposed an eighteen-year custodial term with a nine-year parole disqualifier on count four, and a concurrent five-year term on count six. All other convictions merged.

A-2838-16T1

E.

The Appeal

In his brief on appeal, defendant presents these arguments for our consideration:

POINT I

THE TRIAL COURT ERRED BY DENYING THE MOTION TO SUPPRESS STATEMENTS ALLEGEDLY MADE BY [DEFENDANT] PRIOR TO THE ADMINISTRATION OF MIRANDA WARNINGS. U.S. CONST., AMENDS. V, XIV.

POINT II

THE TRIAL COURT ERRED BY DENYING THE MOTION TO SUPPRESS NARCOTICS SEIZED AFTER OFFICERS EXPANDED A VEHICLE STOP INTO A WARRANTLESS SEARCH OF [DEFENDANT'S] HOME. U.S. CONST., AMENDS. IV, XIV; N.J. CONST., ART. I, PAR. 7.

A. Despite finding drugs in [defendant's] vehicle, officers lacked a reasonable and articulable basis for asking [defendant] to authorize a search of his home.

B. Moreover, [defendant's] nominal consent to search his home, given after his arrest during the vehicle stop, was involuntary.

POINT III

THE TRIAL COURT VIOLATED THE DEFENDANT'S RIGHT TO BE HEARD, AND RIGHT TO PRESENT A COMPLETE DEFENSE, WHEN IT REFUSED, OVER THE DEFENDANT'S OBJECTION, THE JURY'S REQUEST TO RE-HEAR

11

DEFENSE COUNSEL'S SUMMATION. U.S. CONST., AMENDS. V, VI, XIV; N.J. CONST., ART. I, PARS. 1, 9, 10.

POINT IV

THE LOWER COURT IMPOSED AN EXCESSIVE 18-YEAR DISCRETIONARY PRISON TERM, SUBJECT TO A 9-YEAR DISCRETIONARY PAROLE DISQUALIFIER. THIS COURT SHOULD REMAND FOR RESENTENCING.

A. The lower court failed to assign weights to the sentencing factors.

B. The lower court failed to make any findings about the specific factual circumstances of the instant offense before imposing a discretionary extended term and discretionary parole disqualifier at the high end of each respective range.

II.

We first consider defendant's argument that the trial court erred in denying the suppression of statements he made to the police at the roadside before they issued Miranda warnings to him. We reject this claim, although based on a somewhat different analysis than the motion judge.

We review a trial court's factual findings from a suppression hearing involving a defendant's self-incrimination claims under "a deferential standard." State v. Stas, 212 N.J. 37, 48 (2012). Our appellate function, as it relates to the facts, is to consider "'whether the findings made could reasonably have been reached on sufficient credible evidence present in the record.'" Id. at 49 (quoting

12

State v. Locurto, 157 N.J. 463, 471 (1991)).  Even so, we review the trial court's legal analysis de novo.  State v. Handy, 206 N.J. 39, 45 (2011).

Several basic principles of constitutional law guide our review of this self-incrimination issue.  The procedural safeguards of the Miranda doctrine attach when a criminal suspect is subject to a custodial interrogation.  Oregon v. Mathiason, 429 U.S. 492, 495 (1977).  "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  Miranda, 384 U.S. at 444.  Custody does "not necessitate a formal arrest, nor does it require physical restraint in a police station, nor the application of handcuffs, and may occur in a suspect's home or a public place other than a police station."  State v. Godfrey, 131 N.J. Super. 168, 175 (App. Div. 1974) (citations omitted). "The critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors."  State v. P.Z., 152 N.J. 86, 103 (1997) (citations omitted).

The determination of whether a person was in custody is an objective one, independent of "'the subjective views harbored by either the interrogating officers or the person being questioned.'"  State v. O'Neal, 190 N.J. 601, 622

13

(2007) (quoting Stansbury v. California, 511 U.S. 318, 323 (1994)). Judicial assessment of whether a suspect has been placed in custody is fact-sensitive. The issue must be considered through "a case-by-case approach," in which the totality of the circumstances is examined. Ibid. (quoting Godfrey, 131 N.J. Super. at 175-77).

Applying these standards, we respectfully disagree with the motion judge's legal conclusion that defendant was "free to leave" and thereby not in custody, when he was asked by Officer Moreano at the traffic stop about whether he possessed anything injurious. After the police smelled marijuana in the car, defendant voluntarily informed officers that he had smoked marijuana earlier that day. Before that point in the sequence of events, defendant was not in custody. However, once defendant admitted he had smoked marijuana, coupled with the detected odor of marijuana in the car, the police had a sufficient basis to detain defendant. The police then appropriately ordered defendant out of the car. Objectively, defendant was not free to leave by the time the police ordered him to do so. No reasonable person would think otherwise. See, e.g., O'Neal, 190 N.J. at 616.

The motion judge mistakenly concluded a person in defendant's situation would have reasonably felt free to walk away from the scene. The marijuana odor emanating from the car and defendant's admission to the police of

14

marijuana smoking elevated this situation beyond a "routine traffic stop." Berkemer v. McCarty, 468 U.S. 420, 439 (1984).

Nevertheless, as the situation at the roadside developed, the police were authorized to ask defendant if he had anything in his possession that might injure them. Such a query is authorized, even before the reading of Miranda warnings, to assure the safety of the police officers who are on the scene. See State v. Hickman, 335 N.J. Super. 623, 631-32 (App. Div. 2000) (recognizing the right of police to pose such an inquiry concerning contraband or weapons); see also State v. Toro, 229 N.J. Super. 220-22 (App. Div. 1988).

In response to Officer Moreano's safety-oriented question about having anything that might "poke," "stab," or "harm" the officer, defendant chose to reply with a non-responsive admission that he had "two bundles" on his person. This admission was voluntary in the context presented.

We stress the officers did not ask defendant at the scene if he possessed any drugs. Defendant blurted out his revelation of drug possession on his own volition. His revelation was not the product of police interrogation. Instead, it was a self-initiated disclosure. No Miranda violation occurred. Consequently, defendant's "two bundles" statement did not have to be suppressed. The statement was properly admitted at trial.

A-2838-16T1

## III.

Defendant next contends that the motion judge erred in denying his motion to suppress the drugs and paraphernalia discovered through the warrantless search of his residence. In particular, defendant argues he did not provide voluntary consent to those searches, either orally or on the forms presented to him while he was already arrested and in handcuffs. Defendant maintains the trial court incorrectly deemed the searches to be consensual, and that the circumstances that produced his supposed consent were inherently coercive. The State disagrees, and urges that we uphold the motion judge's factual findings and legal conclusions on this consent issue.

The United States Constitution and the New Jersey Constitution both guarantee the right of persons to be free from unreasonable searches and seizure in their home. U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. Warrantless searches are presumptively unreasonable unless, among other exceptions, voluntary consent to the search, without coercion or duress, is provided. State v. Domicz, 188 N.J. 285, 308 (2006); see also State v. Bryant, 227 N.J. 60, 69 (2016). The State has the burden of demonstrating that the consent-to-search exception applies. State v. Legette, 227 N.J. 460, 472 (2017). Moreover, "[t]he State's burden is particularly heavy when the search is conducted after warrantless entry into a home." Ibid. (recognizing that the home "bears special

16

status"). See also Bryant, 227 N.J. at 69 ("Indeed, 'we accord the highest degree of protection to privacy interests within the home' . . . because 'the sanctity of one's home is among our most cherished rights.'") (first quoting State v. Johnson, 193 N.J. 528, 532 (2008); and then State v. Frankel, 179 N.J. 586, 611 (2004)). Our Supreme Court has held that in order for a search "[t]o be voluntary, the consent must be unequivocal and specific and freely and intelligently given." King, 44 N.J. at 352 (internal quotations omitted).

An "essential element" of such consent is the individual's "knowledge of the right to refuse [it]." State v. Johnson, 68 N.J. 349, 353-54 (1975). Whether spoken or written, such "assent . . . is meaningless unless the consenting party understood his or her right to refuse" to give it. State v. Suazo, 133 N.J. 315, 323 (1993) (citing Johnson, 68 N.J. at 353-54). Consent is generally a factual question, determined by an assessment of the totality of the circumstances. State v. Koedatich, 112 N.J. 225, 264 (1988). However, trial courts must adhere to established legal principles in evaluating those circumstances.

In its seminal opinion on this subject in King, the Supreme Court articulated several factors to guide courts in our State as to whether a person's supposed consent for police to search a dwelling without a warrant is voluntary. As the Court stated, these following five "King factors" weigh against voluntariness, and tend to show that a person's consent was coerced:

17

(1) that consent was made by an individual already arrested; (2) that consent was obtained despite a denial of guilt; (3) that consent was obtained only after the accused had refused initial requests for consent to search; (4) that consent was given where the subsequent search resulted in a seizure of contraband which the accused must have known would be discovered; and (5) that consent was given while the defendant was handcuffed.

[Id. at 352-53.]

Additionally, the Court in King delineated three offsetting factors that can weigh in favor of a finding of voluntariness. Those offsetting factors are whether: "(1) consent was given where the accused had reason to believe that the police would find no contraband; (2) defendant admitted his guilt before consent; (3) defendant affirmatively assisted the police officers." Id. at 353.

The Court in King explained that the "existence or absence of one or more of the above factors in not determinative of the [voluntariness] issue." Ibid. Because the factors "are only guideposts to aid a trial judge in arriving at his conclusion," a trial judge should determine the issue of voluntary consent by considering "the totality of the particular circumstances of the case before him." Ibid. Ultimately, the Court concluded in King, that "the trial judge is in a better position to weigh the significance of the pertinent factors than is an appellate tribunal." Ibid. (emphasis added).

18

Recently, in State v. Hagans, 233 N.J. 30, 42 (2018), the Supreme Court reaffirmed the continued applicability of the King voluntariness factors. As the Court reiterated in Hagans, the King factors should not be applied mechanically, and that, ultimately, the totality of circumstances dictate the outcome. Id. at 42-43.

Here, the motion judge's April 6, 2016 written opinion upholding the residential search on consent grounds recited the five King factors that tend to show coercion and involuntary conduct. Unfortunately, the opinion did not apply those individual factors expressly to the evidence. Moreover, the opinion does not list or apply the three offsetting King factors at all.

To be sure, the motion judge's opinion discusses the "totality of circumstances" conceptually. But unfortunately no factor-by-factor King analysis to guide that assessment for each stage of the residential search appears in the opinion. See R. 1:7-4(a) (mandating adequate statements of reasons that support trial court rulings to enable future appellate review).

At oral argument on the appeal, we asked counsel about the implications of the omission of a King analysis from the trial court's suppression decision. Following that argument, the Attorney General submitted a letter to this panel advising that "[t]he State agrees that a limited remand would be appropriate to allow the [motion] judge the opportunity to consider the issue, and set forth a

19

more robust record as to his analysis of the King factors." Defense counsel thereafter submitted a letter opposing a remand for this purpose. The defense essentially maintains it is self-evident that the "consents" provided by defendant to the search of the residence and the safe manifestly were coerced under a King analysis.

With the State's acquiescence, we choose to remand this matter for the motion judge to perform a complete factor-by-factor King analysis as to each successive oral and written consent-to-search provided by defendant. We do so because the motion judge retains the unique ability to connect those legal factors to his credibility assessments and the testimony that he heard from multiple witnesses at the two-day suppression hearing. This deference to a trial court's "feel" for the evidence is consistent with the Court's direction in King itself, which recognized, as we have already noted, that trial judges usually are in "a better position" than an appellate tribunal to "weigh the significance of the pertinent [King] factors." King, 44 N.J. at 353.

To accommodate the remand, we request the parties to provide courtesy copies of their appellate briefs, appendices, and pertinent transcripts to the motion judge. Following those submissions, the judge shall have discretion to hear oral argument or request any further submissions.

20

We do not forecast in advance what conclusions the motion judge is likely to draw. If, on closer examination, the judge concludes the King factors weigh against the State and the totality of circumstances reflect involuntariness, the drug evidence must be suppressed and defendant is entitled to a new trial, with the State preserving its appellate rights from that ruling. Conversely, if the judge finds the King factors weigh in the other direction and the totality of circumstances indicate defendant's voluntary consent, the denial of the suppression motion shall be renewed, and defendant may bring a new appeal from that post-remand decision.

To assist the motion judge in this endeavor, we note that several (but not all) of the factors in the King analysis are clearly present or absent. As to the five involuntariness factors, the State concedes that King factor one (defendant was "under arrest when his consent was sought") is established. The State also concedes the presence of factor four ("consent was give where the subsequent search resulted in a seizure of contraband which the accused must have known would be discovered"). Indeed, that point is the very heart of the State's trial theory: that defendant knowingly possessed the drugs and paraphernalia found in the residence.

Although the State disagrees, we also hold that King factor five ("consent was given while the defendant was in handcuffs") is patently clear. The mere

21

fact the officers temporarily removed the handcuffs several times from defendant to enable him to turn a key or to sign a consent form does not matter.

As to the offsetting King factors, we hold that offsetting factor two ("defendant admitted his guilt before consent") is not established here. To the contrary, even by the officers' accounts, defendant kept insisting that the police would not find anything in the residence to incriminate him.

The remaining positive and offsetting King factors are left to the motion judge's careful reassessment.

In light of our remand on these grounds, we further request the motion judge to reexamine whether the police had the right at the scene of the motor vehicle stop – after arresting and handcuffing defendant – to ask him to consent to a search of his residence located several blocks away. This reexamination should proceed in light of pertinent case law, including State v. Carty, 170 N.J. 632, 635 (2002) (invalidating certain suspicionless consent searches in motor vehicle stops) and Domicz, 188 N.J. at 285 (distinguishing the context of consent to search a home provided at the home from consent to search a motor vehicle at the roadside). In light of this case law and a comparison of the present facts to those in the reported cases, the motion judge should reexamine his finding that the residence was known to police as a place of drug activity justified the police in requesting defendant's consent and in transporting him in

22

handcuffs there.  Again, we do not prescribe or forecast the result on remand that may come from such a deeper analysis.

We respectfully request that the trial court complete the remand within 120 days.  In the meantime, defendant's judgment of conviction and sentence shall remain unaltered.

IV.

We turn to the novel legal issue of whether the trial judge had the authority to grant the deliberating jurors' request to have defense counsel's closing argument played back or read back to them.  This issue has not yet been the subject of any reported opinions in our State.

A.

The chronology pertinent to this playback issue is as follows.  The jurors were read the court's charge on Friday, September 16, 2018.  After some deliberations, the jurors submitted a question to the court that day that read: "The jury wants to confirm if [defendant] admitted and officially [sic] that he had two bundles in his pocket. Who alleges that [defendant] said this?"  The trial judge informed the jurors that he could not answer this question, and instead they had to rely on their own recollection of the evidence presented.

Later that day, the jurors sent another note to the court that read: "We don't have unanimous votes.  Are we going to wait for your advice?"  The judge

23

summoned the jurors back into the courtroom and told them that, because it was nearly 5:00 p.m. on a Friday, he was going to discharge them for the weekend. The judge instructed the jurors to return to court Monday morning to continue deliberations.

On Monday, September 19, the court started the day by replacing a juror, with no objection from counsel, with an alternate juror. The reconstituted jury then resumed its deliberations.

After a lunch order was arranged, the deliberating jurors sent a note to the court that read: "We would like to hear the defense summation again." Before calling the jurors back into the courtroom, the trial judge advised the prosecutor and defense counsel that he intended to respond to this request by telling the jurors that "openings and summations are not evidence [and] . . . they're going to have to rely upon their recollections."

Defense counsel urged the court to reconsider playing back the summations, even though they are not evidence. Counsel advised that a judge in the same vicinage had recently granted such a request, although that case was not precedential. The State objected, arguing that summations are not considered evidence and therefore should not be replayed.

The judge agreed with the State's position. The jurors were brought back into the courtroom. The judge explained to them that he would not replay

24

summations because they are not considered evidence. He instructed them to rely on their recollections of the evidence to guide their decision.

The jurors also asked the court to replay the trial testimony of Officer DeJesus. The judge agreed to do so. He informed the jury the playback of the officer's direct and cross-examination would take about seventy minutes. The court took a short recess to arrange the playback. Before the playback occurred, the jurors sent back another note that said, "The jury is already satisfied with the answer given. We decided to withdraw the other request. The jury has reached a unanimous decision."

The jurors returned to the courtroom and issued their verdict, finding defendant not guilty on the manufacturing charge in count one, but guilty of the remaining charges. The judge polled the jurors individually and confirmed their verdict was unanimous.

## B.

The core issue posed to us is whether a trial judge may – as at least one judge in the vicinage had apparently done – grant a jury's request to have all or parts of counsel's closing arguments played or read back to the jury a second time. To resolve this question, we consider the important functional role that closing arguments can have in trial practice, particularly in a jury trial.

25

Unlike an opening statement from trial counsel, which can only preview what evidence is anticipated, a closing argument provides an important chance for all counsel to highlight and analyze the proofs that were actually presented at the trial. An effective summation can helpfully tie together for the trier of fact the various pieces of evidence, and explain how those pieces do or do not fit into the advocate's theory of the case.

In a criminal case such as this one, summations can supply an organized and focused explanation of how the evidence does or does not satisfy the elements of an offense, and how those proofs do or do not establish a defendant's guilt beyond a reasonable doubt. Closing arguments can also spotlight the testimony of certain witnesses, and address how cross-examination or other evidence either impeached (or, conversely, bolstered) the credibility of those witnesses. In essence, the summation has an important function of providing a coherent analysis of the evidence for the jury, or for the judge in a non-jury case.

The United States Supreme Court expounded upon these important principles in Herring v. New York, 422 U.S. 853 (1975). In that case, the Court struck down as unconstitutional under the Sixth Amendment a New York statute that gave trial judges the discretion to disallow closing arguments of counsel in non-jury criminal cases. The Court reasoned in Herring that such closing

26

arguments are a vital part of trial counsel's advocacy role. We repeat here portions of the Court's insights concerning that role:

> The widespread recognition of <u>the right of the defense to make a closing summary of the evidence to the trier of the facts, whether judge or jury, finds solid support in history</u>. In the 16th and 17th centuries, when notions of compulsory process, confrontation, and counsel were in their infancy, the essence of the English criminal trial was argument between the defendant and counsel for the Crown. Whatever other procedural protections may have been lacking, there was no absence of debate on the factual and legal issues raised in a criminal case. As the rights to compulsory process, to confrontation, and to counsel developed, the adversary system's commitment to argument was neither discarded nor diluted. Rather the reform in procedure had <u>the effect of shifting the primary function of argument to summation of the evidence at the close of trial, in contrast to the "fragmented" factual argument that had been typical of the earlier common law</u>.
>
> [<u>Id.</u> at 860-61 (emphasis added).]

As the Court further elaborated:

> <u>It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case</u>. For it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole. Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions. And for the defense, <u>closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt</u>.

27

The very premise of our adversary system of criminal justice is that <u>partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free</u>. In a criminal trial, which is in the end basically a fact finding process, <u>no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment</u>.

[<u>Id.</u> at 862 (emphasis added) (citation omitted).]

Having emphasized these fundamental principles, the Court in <u>Herring</u> acknowledged that an attorney's right to present a closing argument is not unbounded:

<u>This is not to say that closing arguments in a criminal case must be uncontrolled or even unrestrained. The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations</u>. He may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant. He may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial. <u>In all these respects he must have broad discretion</u>.

. . . .

Some cases may appear to the trial judge to be simple – open and shut – at the close of the evidence. And surely in many such cases a closing argument will, in the words of Mr. Justice Jackson, be "likely to leave [a] judge just where it found him." But just as surely, there will be cases where closing argument may correct a premature misjudgment and avoid an otherwise erroneous verdict. And there is no certain way for a

28

> trial judge to identify accurately which cases these will be, until the judge has heard the closing summation of counsel.
>
> [Id. at 863 (emphasis added) (citations omitted).]

See also Thomas A. Mauet, Trial Techniques 387 (8th ed. 2010) ("Closing arguments are the chronological and psychological culminations of a jury trial. They are the last opportunity to communicate directly with the jury.").

New Jersey case law has recognized these general principles. See R. 1:7-1(b) (granting counsel a right to present closing statements at the end of a case "except as may be otherwise ordered by the court"); see also State v. Briggs, 349 N.J. Super. 496, 500-01 (App. Div. 2002) (citing Herring by analogy in upholding defense counsel's right to present "meaningful argument" at sentencing).

In keeping with these concepts, our trial courts have been granted the discretion to allow counsel to present supplemental closing arguments in appropriate circumstances, particularly where there has been a significant gap in time between deliberations stopping and resuming, or where a legal issue has arisen that might warrant further advocacy. See, e.g., State v. Rovito, 99 N.J. 581, 588 (1985) (finding no error when a trial court granted an additional ten minutes to both parties to present supplementary summations after the court decided to charge the jury on an additional provision after the completion of

29

summations); see also State v. Speth, 324 N.J. Super. 471 (Law Div. 1997), aff'd, 323 N.J. Super. 67 (App. Div. 1999) (in which the trial court permitted both sides to supplement any summations after deliberations were underway, in a complex case where lengthy deliberations over several weeks had been interrupted by religious holidays and a weekend).

C.

Mindful of the well-established important function of summations, we now turn to the principles that pertain to the process of playing back or reading back portions of a trial, when requested by a jury.

Our courts have long recognized that juries sometimes will ask to review testimony when they are in the midst of deliberations. The Supreme Court has held that "[a]bsent 'some unusual circumstance,' those requests should be granted." State v. Miller, 205 N.J. 109, 119-20 (2011) (quoting State v. Wolf, 44 N.J. 176, 185 (1965)). The Court reasoned in Miller that "[t]he requests are a clear sign that the evidence sought is important to the deliberative process" and therefore, "the 'true administration of justice' requires that judges typically accede to jury requests to review testimony." Miller, 205 N.J. at 120.

Comparably, judges who have reserved decision in a case sometimes play back the recorded arguments of counsel. They do so in order to refresh or clarify

30

their recollections before issuing a ruling. Jurors understandably may want a similar opportunity before rendering a verdict.

Trial courts have "broad discretion as to whether and how to conduct read-backs and playbacks." Id. at 122; see also State v. Wilson, 165 N.J. 657, 660 (2000) ("It is well-established that 'the reading of all or part of the testimony of one or more of the witnesses at a trial, criminal or civil, at the specific request of the jury during their deliberations is discretionary with the trial court.'") (quoting Wolf, 44 N.J. at 185). A party opposing the playback of testimony has the burden to object and demonstrate prejudice. Miller, 205 N.J. at 124; see also State v. Ortiz, 202 N.J. Super. 233, 245 (App. Div. 1985).

The trial judge in the present case rightly noted that, unlike trial testimony, the arguments of counsel are not evidence, and should not be treated by a jury as such. Our Model Jury Charges reinforce that principle. See, e.g., Model Jury Charges (Criminal), "Criminal Final Charges" (rev. May 12, 2014). This does not mean, however, that jurors categorically are prohibited from hearing once again the closing arguments of counsel on appropriate terms and conditions – if, for some reason that arises in their deliberations, they wish to have those arguments repeated or replayed.

Jurors may have difficulty remembering exactly what counsel said in summations about a hotly disputed aspect of the evidence. Jurors also may not

31

have heard the words of counsel in summation clearly if counsel spoke softly or mumbled, or they might not have understood them.

In such rare circumstances when they arise, we discern no reason why a playback or readback of closing arguments should be categorically disallowed, provided, of course, the summations of both sides are presented. Instead, trial courts should maintain the discretion to allow or disallow such requests, in the interests of justice.[3]

Other jurisdictions, most notably California, have recognized a trial court's discretionary authority to allow such readbacks or playbacks. As the California Supreme Court stated in People v. Gordon, 792 P.2d 251, 274 (Cal. 1990), "We do not doubt that a trial court's inherent authority regarding the performance of its functions includes the power to order argument by counsel to be reread to the jury or to be furnished to that body in written form. The exercise of such power must be entrusted to the court's sound discretion." (Emphasis added). See also People v. Pride, 833 P.2d 643, 680 (Cal. 1992) (noting the trial court correctly concluded that it had discretion to deny the jury's request to playback summation and "expressed appropriate concern over diverting the

---

[3] By analogy, our Rules of Court have been amended to require a written copy of the court's instructions in criminal cases to be provided to jurors in the jury room, in recognition that jurors may have trouble remembering the precise words of those instructions. See R. 1:8-8(b)(2).

jury's attention from proper consideration of the evidence and instructions"); People v. Sims, 853 P.2d 992, 1021 (Cal. 1993) (noting the "trial court erred in suggesting that it lacked authority to order the reading back of defense counsel's closing summation," but concluding the error was not prejudicial); People v. Gurule, 51 P.3d 224, 286 (Cal. 2002) (finding no abuse of discretion where a trial court declined a request for readback of closing argument, particularly when defense counsel's closing arguably had misstated the law).

New York courts likewise have recognized this principle. See, e.g., People v. Jones, 483 N.Y.S.2d 89, 89 (App. Div. 1984) (noting the trial court's discretion to grant such a jury request, but finding no "improvident" exercise of that discretion in denying the request in that case); People v. Foster, 499 N.Y.S.2d 808, 808 (App. Div. 1986) (finding no error in the court's denial of a similar jury request).

The only jurisdiction we know of that disallows the playback or readback of counsel's summations is Vermont, which perceived a risk of prejudice in engaging in such a procedure where only the State's summation was read back. State v. Fitzgerald, 449 A.2d 930, 932 (Vt. 1982) (criticizing a trial court for allowing a rereading of only a prosecutor's summation without the defense summation, but finding no "clear error" requiring the jury's verdict to be overturned).

33

Consistent with the practice in California and New York, we hold that trial courts in New Jersey have the discretion to grant requests from juries to play back or read back closing arguments. In exercising that discretion, courts may consider such factors as: (1) whether counsel made improper or inflammatory remarks in summation; (2) whether counsel materially misstated the evidence; (3) whether multiple objections to the closing arguments had been interjected, and whether they were sustained or overruled; (4) the length and complexity of the trial; (5) whether deliberations had been lengthy or significantly interrupted; and (6) other practical and equitable considerations.

Applying these precepts of discretion to the present case, we find no reason to grant defendant a new trial on this basis. The trial was not particularly lengthy. The issues were not especially complex. The jurors' deliberations only covered portions of two days. The weekend gap between those two days was not protracted. Although defense counsel was interrupted in summation a few times by the prosecutor with objections, none of those interruptions was exceptional.

While it may have been helpful, in retrospect, for the trial court to have accommodated the jurors' request to hear the closing arguments again, the denial of their request was not an abuse of discretion, nor a reversible error mandating a new trial. Notably, the jurors decided to forego a playback of Officer

34

DeJesus's testimony, after being told that his playback would consume about seventy minutes. A playback of both counsel's summations presumably would have taken considerable time, and it is possible the jurors would have eschewed that playback as well. We will not speculate that the denial of the playback request was prejudicial to either party.

In sum, although we agree with defendant that the trial court did possess the inherent authority to grant the jurors' playback request, the court did not misapply its discretion in denying it. Moreover, the denial did not manifestly prejudice defendant, certainly not to a degree warranting a new trial. R. 2:10-2.

## V.

Defendant's final contention – that his sentence is excessive – requires little comment. As the sentencing judge noted, defendant had seven prior indictable convictions, several of them for narcotics offenses and one of them for aggravated manslaughter. The judge's assessment of the aggravating and mitigating factors, while not expressed in expansive terms, does not warrant our second-guessing of those factors on the record presented. The sentence imposed by no means shocks our conscience. State v. Bienick, 200 N.J. 601, 612 (2010).

Affirmed in part, and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

35